UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ENRICO L. THOMPSON,

      Petitioner,

v.                                        Case No. 3:14-cv-669-J-34JRK

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

      Respondents.

_____

## ORDER

### I. Status

Petitioner Enrico L. Thompson, an inmate of the Florida penal system, initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus By a Person in State Custody (Petition, Doc. 1). In the Petition, Thompson challenges a 2008 state court (Duval County, Florida) judgment of conviction for burglary of a dwelling. Thompson also filed a Memorandum in Support of his Petition. See Petitioner's Reply to State's Response and Memorandum of Law in Support of Petition for Writ of Habeas Corpus 28 U.S.C. § 2254 (Pet. Memo., Doc. 3). Respondents submitted an Answer to Petition for Writ of Habeas Corpus. (Response, Doc. 19) with exhibits (Resp. Ex.). Thompson filed a Reply. See Petitioner's Reply to State's Response and Memorandum of Law in Support of Petition for Writ of Habeas Corpus 28 U.S.C. § 2254 (Reply, Doc. 20). This case is ripe for review.

## II. Procedural History

On May 30, 2008, the State of Florida charged Thompson by information in count one with burglary of a dwelling and in count two with resisting a law enforcement officer without violence.[1]  Resp. Ex. 1 at 10.  Subsequently, the State filed notices of intent to classify Thompson for purposes of sentencing as a Habitual Felony Offender (HFO) and a Prison Release Reoffender (PRR).  Id. at 11, 19.

Thompson proceeded to trial on October 7, 2008.  Resp. Ex. 3A.  At trial, the State presented evidence that Jacksonville Sheriff's Officers Rodgers and Ulsch were dispatched to 1829 East 25th Street on May 7, 2008, for a reported burglary in progress.  Resp. Ex. 3A at 217-19, 256-57.  Located at the address was a single level house surrounded on all four sides by a chain link fence.  Id.  At the time, the house was an unoccupied rental, and no one had lived there for four months.  Id. at 327-28.  Upon arrival, Rodgers saw Thompson in the back yard or side yard inside the fence, crouched over or standing (bent over at the waist) next to a large object, touching its sides and top, and looking in the direction of Rodgers, who was driving a marked police car.  Id. at 223-24, 226-28.  When Rodgers exited his patrol vehicle, Thompson hopped the fence and ran.[2]  Id. at 228.  Rodgers and Ulsch chased Thompson, who hopped several fences.[3]

---

[1] According to the circuit court docket, Count two was nolle prossed on December 10, 2008.  Resp. Ex. 1, Docket at 5.

[2] According to the arrest and booking report, Thompson explained that he had been in the backyard to urinate.  Resp. Ex. 1 at 2.  The report ambiguously states that the detective "mirandized the suspect during interrogation."  Id.  In any event, the statement was not introduced as evidence at the trial, although defense counsel referred to it at sentencing.  See id. at 127.

[3] Thompson's height is 5'3", and he weighed 150 pounds.  Resp. Exs. 1 at 1; 3A at 288.

Id. at 229-30. After Ulsch apprehended and handcuffed Thompson, Rodgers searched him and found a pocketknife in his pocket before placing Thompson in the patrol car. Id. at 230-31, 241, 265. Rodgers also determined from Thompson's state ID card that he lived at 1803 East 25th Street, approximately three or four houses away from 1829. Id. at 235.

Returning to 1829 East 25th Street, Rodgers determined that the large object was an air conditioning (AC) unit that had been detached completely from the rear of the house and was lying on its side.[4] Id. at 232, 243, 271. The state presented evidence that the AC unit previously had been fully attached to the back side of the 1829 residence and completely surrounded by a cage comprised of black steel tubing, secured by a key padlock. Id. at 239-40, 297, 332-33, 347. The lock, which had what appeared to be saw marks, had been removed, either cut off or beaten off, id. at 285, 308, 347, and the cage was damaged, id. at 280. Wires were sticking out of the house from where the AC unit had been wired into the house, id. at 240, 297, 308, and the electrical conduit and copper piping on the AC unit had been cut to detach it from the house, id. at 297. Law enforcement found a two-by-four leaned up against the fence, less than a foot away from the AC unit, and a black t-shirt draped over the AC unit.[5] Id. at 240, 291, 297.

---

[4] The court precluded defense counsel from asking the witnesses if the AC unit was heavy or if they tried to lift it, but defense counsel was permitted to elicit testimony that two officers and a dolly were used to move the AC unit. Resp. Ex. 3A at 305.

[5] A third officer (Campanaro) responded to the scene at 10:00 p.m. that night to take photographs and preserve the evidence. Id. at 293-94, 297-98. Campanaro did not collect the two-by-four as evidence. Id. at 310. However, Campanaro testified to his opinion that the two-by-four had become worn from someone trying to apply pressure to it and that the two-by-four could have been used used to lift up the AC unit using leverage. Id. at 310-11.

At the close of the State's case, defense counsel moved for a judgment of acquittal. Id. at 351-52. Among other reasons, defense counsel argued that the State had "failed to prove there was the ability [to commit the crime], whether or not it was done stealthily or not, failed to present any evidence in that regards to this." Id. at 352. In response, the State argued in part that Thompson intended to commit the offense of theft with intent to steal the air-conditioning unit. Id. at 353. The Court then ruled:

> THE COURT: Okay. The State has presented a prima facie case that if the jury chooses to believe it that the defendant entered the curtilage of this place which was designed to be a dwelling with the intent to commit a theft therein. The intent need not be to steal the whole air-conditioner, but if he was going to steal copper wiring out of it, that makes whether he could lift the air-conditioner or not irrelevant.
>
> [DEFENSE COUNSEL]: Your Honor, no evidence has been presented as to that either.
>
> THE COURT: Well, what evidence could there be of any intent other than his acts that he did? I'm just answering your statement about his ability.
>
> I don't think they have to show he had the ability to carry that air-conditioner off to prove intent to commit the offense of theft in there. So I'll deny the motion for judgment of acquittal.

Id. In closing argument, the State argued that

> The AC unit was right next to a fence, a fence going over to the other property. The AC unit was a foot or less than a foot from a very convenient lever or some kind of moving device as Officer Campanaro told you, a two by four. Already propped up on the fence. The defendant already had his hands ready to go to try to move the AC unit to get it up and over the fence.

Resp. Ex. 3B at 389; see also id. at 415 ("That two by four just happened to be a great way to get an air-conditioning unit over the fence."). But the State also advanced for the

first time the theory that Thompson "was trying to steal either the AC unit or parts of the AC unit. He was intending to steal it or steal its parts."[6] Resp. Ex. 3B at 389.

Thompson did not testify. Resp. Ex. 3A at 354-56. During trial, Thompson responded to the court's questions twice. First, prior to opening statements, a juror belatedly realized that she and a testifying officer were neighbors. Id. at 201-07. After both counsel stated that they did not have a problem with the juror remaining on the jury, the court asked Thompson if he agreed, and he responded, "Yes, sir." Id. at 207. Next, after the court advised Thompson of his right to testify or not testify, the court asked:

THE COURT:      You understand all that?

THE DEFENDANT: Yes, sir.

THE COURT:      Have you had a chance to discuss that with your attorneys?

THE DEFENDANT: Yes, sir.

THE COURT:      Have you made a decision about whether you want to take the stand or not?

THE DEFENDANT: No, I'm not, sir.

THE COURT:      You don't want to take the stand?

---

[6] See also Resp. Ex. 3B at 390 ("He knew that stealing this AC unit, stealing its parts was wrong . . . ."); id. at 391 ("there is no requirement for us to prove that this defendant had the ability to actually commit the theft, simply that he intended to do it, simply that he intended to take that unit or to take the parts of that unit"); id. ("we've shown that to you by proving this defendant's intent to steal that AC unit or its parts"); id. at 424 ("Simply because we haven't put on evidence saying that he's the one who got it to the fence, does not in anyway negate the fact that the State has proven that this defendant intended to steal this unit or its parts."); id. at 426 ("The defendant formed the intent that he wanted to go inside that fence and that he wanted to steal either that AC unit or the parts of that AC unit. . . . [H]e had already decided he was going to steal it, or steal a part of it."); id. at 427 ("We don't have to show you how he was going to finish it, we don't have to show you how the defendant was going to get the AC unit over the fence, we don't have to show you how the defendant was going to take the property off the AC unit, only that he intended to steal it or to steal parts of it.").

THE DEFENDANT: No, sir.

Resp. Ex. 3A at 356.

On October 7, 2008, a jury found Thompson guilty of burglary of a dwelling, as charged in count one. Resp. Exs. 1 at 39; 3B at 450-51. Through counsel, Thompson filed a motion for new trial, followed by an amended motion for new trial, which the court denied. Resp. Ex. 1 at 97-102.

On November 16, 2008, defense counsel moved to continue Thompson's sentencing, explaining that she was "going to have Mr. Thompson examined for two purposes." Id. at 100. Counsel disclosed no further details. At sentencing on December 10, 2008, the court asked Thompson if he wanted to make any statements, and he replied, "No, sir." Resp. Ex. 1 at 125-26. His counsel relied on the presentence investigation report and argued in mitigation:

> Your Honor, the report also reflects Mr. Thompson's background as well as indicating that he has always been – he was in slow classes throughout. And in review of several documents, as well as a report indicates that his IQ is a 59 in the verbal, a performance of 63, and a full scale of 57. Indicating that he borders on the borderline of retarded[7] based on those reports and based in regards to his school records.

---

[7] "In referring to 'mental retardation' throughout this opinion, [the Court] recognize[s] that increasingly professionals in this field, such as the American Association on Intellectual and Developmental Disabilities (formerly the American Association on Mental Retardation), are replacing the term 'mental retardation' with 'intellectual disability' or 'intellectual developmental disability.' In this opinion, however, [the Court] use[s] the term 'mental retardation' to maintain consistency with the terminology used through [Thompson's postconviction proceedings] and relevant precedent." Burgess v. Comm'r, Ala. Dep't of Corr., 723 F.3d 1308, 1310, n.1 (11th Cir. 2013).

Id. at 127.[8]  The trial court found that Thompson qualified as an HFO and PRR.  At the prosecutor's request, the court imposed the maximum sentence of twenty years of imprisonment as an HFO, with fifteen of those years to be served as a minimum mandatory as a PRR.  Id. at 129-30.  After imposing sentence, the court asked Thompson:

> THE COURT:          . . . Do you want to file an appeal?
>
> THE DEFENDANT: Yes.
>
> THE COURT:          Can you afford to hire your own lawyer for the appeal?
>
> THE DEFENDANT: (Shakes head negatively.)
>
> THE COURT:          Do you want me to appoint the public defender?
>
> THE DEFENDANT: (Nods head affirmatively.)

Id. at 34.

Thompson filed a notice of appeal to the First District Court of Appeal (First DCA).  Id. at 85-86.  With the benefit of counsel, Thompson then filed a motion to correct sentencing error in the trial court pursuant to Florida Rule of Criminal Procedure 3.800(b)(2) (Resp. Ex. 4), which was summarily denied by order dated March 10, 2009.  Resp. Ex. 5.  Through counsel, Thompson filed an initial brief in the appellate court, challenging only the constitutionality of the habitual felony offender statute (Resp. Ex. 6), and the state filed an answer brief.  Resp. Ex. 7.  Issuing a written opinion, the First DCA affirmed Thompson's judgment of conviction and sentence on December 15, 2009.  Resp.

---

[8] Neither the presentence investigation report nor the report of results of IQ testing are in either the record on appeal before the First DCA or the record before this Court.

Ex. 8; Thompson v. State, 23 So. 3d 235 (Fla. 1st DCA 2009). Thompson did not file a notice to invoke the discretionary jurisdiction of the Florida Supreme Court. Resp. Ex. 9.

On January 29, 2010, Thompson filed a pro se motion for reduction or modification of sentence in the state circuit court pursuant to Florida Rule of Criminal Procedure 3.800(c). Resp. Ex. 9. Without an evidentiary hearing, the court summarily denied Thompson's Rule 3.800(c) motion on April 12, 2010. Id.

On November 12, 2010, Thompson filed a pro se motion to vacate pursuant to Florida Rule of Criminal Procedure 3.850. Resp. Ex. 10. On April 4, 2012, Thompson filed a pro se "Motion for Permission to Leave to Supplement Defendant's Original Motion for Post Conviction Relief," which the court denied. Resp. Ex. 11. The state circuit court then summarily denied Thompson's Rule 3.850 motion to vacate without evidentiary hearing by order dated September 9, 2013. Resp. Ex. 13. Thompson filed a notice of appeal to the Florida First DCA (Resp. Ex. 14) and a pro se initial brief in the appellate court (Resp. Ex. 15). The First DCA per curiam affirmed the circuit court's summary denial of post conviction relief without opinion. Resp. Ex. 16. Thompson v. State, 136 So. 3d 1219 (Fla. 1st DCA 2014) (table).

### III. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted); Jones

v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [Thompson's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

### IV. Limits of Habeas Relief, Exhaustion and Procedural Default

#### A. Limits of Habeas Relief

Federal habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991) (citations omitted). As such, federal habeas "does not lie for errors of state law." Id. at 67 (quotations omitted). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Id. at 67-68. As such, federal courts may not review claims based exclusively on state law issues even if the claims are "couched in terms of equal protection and due process." Branan v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1988) (quotation omitted).

#### B. Exhaustion

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b), (c). To exhaust state remedies, the petitioner must "fairly present[ ]" every issue raised in his federal petition to the state's highest court, either on direct appeal

or on collateral review. <u>Castille v. Peoples</u>, 489 U.S. 346, 351 (1989) (emphasis omitted).

As the United States Supreme Court has explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'"opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (per curiam) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. <u>Duncan</u>, <u>supra</u>, at 365-366, 115 S. Ct. 887; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999).

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004); <u>see also</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

To fairly present a claim, the petitioner must present it to the state courts as a federal, constitutional claim rather than as a matter of state law. <u>See</u> <u>Duncan</u>, 513 U.S. at 365-66; <u>Preston v. Sec'y, Fla. Dep't of Corr.</u>, 785 F.3d 449, 456-59 (11th Cir. 2015). To do so, a petitioner can include "the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" <u>Baldwin</u>, 541 U.S. at 32. But raising a state law claim that "is merely similar to the federal habeas claim is insufficient to satisfy the fairly presented requirement." <u>Duncan</u>, 513 U.S. at 366. Likewise, merely citing to the federal constitution is insufficient to exhaust a claim in state court. <u>Anderson v. Harless</u>, 459 U.S. 4, 7 (1982); <u>see also</u> <u>McNair v. Campbell</u>, 416 F.3d 1291, 1302 (11th Cir. 2005) ("'The exhaustion doctrine requires a habeas

applicant to do more than scatter some makeshift needles in the haystack of the state court record.'") (quoting Kelley v. Sec'y for the Dep't of Corr., 377 F.3d 1317, 1343-44 (11th Cir. 2004)). As explained by the Eleventh Circuit:

> To "fairly present" a claim, the petitioner is not required to cite "book and verse on the federal constitution." Picard v. Connor, 404 U.S. 270, 278, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971) (quotation omitted). Nevertheless, a petitioner does not "fairly present" a claim to the state court "if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin, 541 U.S. at 32, 124 S. Ct. 1347. In other words, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." Jimenez v. Fla. Dep't of Corr., 481 F.3d 1337, 1342 (11th Cir. 2007) (quoting Snowden v. Singletary, 135 F.3d 732, 735 (11th Cir.1998)) (concluding that the petitioner's claims were raised where the petitioner had provided enough information about the claims (and citations to Supreme Court cases) to notify the state court that the challenges were being made on both state and federal grounds).

Lucas v. Sec'y, Dep't of Corr., 682 F.3d 1342, 1352 (11th Cir. 2012). "The crux of the exhaustion requirement is simply that the petitioner must have put the state court on notice that he intended to raise a federal claim." Preston, 785 F.3d at 457 (11th Cir. 2015); see also French v. Warden, Wilcox State Prison, 790 F.3d 1259, 1270-71 (11th Cir. 2015), cert. denied, 136 S. Ct. 815 (2016).

## C. Procedural Default and Exceptions

"[W]hen 'the petitioner fails to raise the [federal] claim in state court and it is clear from state law that any future attempts at exhaustion would be futile," a procedural default occurs. Owen v. Sec'y, Dep't of Corr., 568 F.3d 894, 908 n.9 (11th Cir. 2009) (quotation omitted); see also Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001) ("The teeth of the exhaustion requirement comes from its handmaiden, the procedural default

doctrine."). In such circumstances, federal habeas review of the claim is typically precluded. Pope v. Sec'y for Dep't of Corr., 680 F.3d 1271, 1284 (11th Cir. 2012); Smith, 256 F.3d at 1138. Nevertheless, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. See Coleman v. Thompson, 501 U.S. 722, 750 (1991); Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010).

To show cause for a procedural default, "the petitioner must demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." Ward, 592 F.3d at 1157 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). "[T]o show prejudice, a petitioner must demonstrate that 'the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness.'" Id. (quoting McCoy v. Newsome, 953 F.2d 1252, 1261 (11th Cir. 1992) (per curiam)).

In the absence of a showing of cause and prejudice, a petitioner may obtain consideration on the merits of a procedurally defaulted claim if he can establish that a failure to consider the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 724. This exception has been described as "exceedingly narrow in scope as it concerns a petitioner's 'actual' innocence rather than his 'legal' innocence." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Id. (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)), cert. denied, 535 U.S. 926 (2002)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523

U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324).  With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected.  <u>Schlup</u>, 513 U.S. at 324.

## V. <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus.  <u>See</u> 28.U.S.C. § 2254; <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016).  "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'"  <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).  As such, federal habeas review of final state court decisions is "'greatly circumscribed' and 'highly deferential.'"  <u>Id.</u> (quoting <u>Hill v. Humphrey</u>, 662 F.3d 1335, 1343 (11th Cir. 2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits.  <u>See</u> <u>Wilson v. Warden, Ga. Diagnostic Prison</u>, 834 F.3d 1227, 1235 (11th Cir. 2016) (en banc), <u>cert. granted</u>, <u>Wilson v. Sellers</u>, 137 S. Ct. 1203 (2017); <u>Marshall v. Sec'y, Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016).  Regardless of whether the last state court provided a reasoned opinion, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  <u>Harrington v. Richter</u>, 562 U.S. 86, 99 (2011); <u>see also</u> <u>Johnson v. Williams</u>, 568 U.S. 289, --, 133 S. Ct. 1088, 1096 (2013).[9]  Thus, the state court need not issue an opinion explaining its rationale in

---

[9] The presumption is rebuttable and may be overcome "when there is reason to think some other explanation for the state court's decision is more likely."  <u>Richter</u>, 562 U.S. at 99-100; <u>see also</u> <u>Williams</u>, 568 U.S. at --, 133 S. Ct. at 1096-97.  However, "the <u>Richter</u>

order for the state court's decision to qualify as an adjudication on the merits. See Richter, 562 U.S. at 100; Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002).

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim, unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 98. The Eleventh Circuit has explained:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.
>
> Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's

---

presumption is a strong one that may be rebutted only in unusual circumstances." Williams, 133 S. Ct. at 1096.

> factual findings "by clear and convincing evidence."  See Burt
> v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348
> (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct.
> 2269, 2282, 192 L.Ed.2d 356 (2015).  Whatever that "precise
> relationship" may be, "'a state-court factual determination is
> not unreasonable merely because the federal habeas court
> would have reached a different conclusion in the first
> instance.'"[10]  Titlow, 571 U.S. at ---, 134 S. Ct. at 15 (quoting
> Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175
> L.Ed.2d 738 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016); see also Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1259 (11th Cir. 2016).  Notably, the Supreme Court has instructed that "[i]n order for a state court's decision to be an unreasonable application of [that] Court's case law, the ruling must be 'objectively unreasonable, not merely wrong; even clear error will not suffice.'"  Virginia v. LeBlanc, 137 S. Ct. 1726, 1728 (2017) (quoting Woods v. Donald, 575 U.S. ---, ---, 135 S.Ct. 1372, 1376 (2015) (per curiam) (internal quotation marks omitted)).  Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits.  See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (regarding § 2254(d)(1)); Landers v. Warden, Att'y Gen. of Ala., 776 F.3d 1288, 1295 (11th Cir. 2015) (regarding § 2254(d)(2)).

Where the state court's adjudication on the merits is "'unaccompanied by an explanation,' a petitioner's burden under section 2254(d) is to 'show [ ] there was no reasonable basis for the state court to deny relief.'"  Wilson, 834 F.3d at 1235 (quoting

---

[10] The Eleventh Circuit has previously described the interaction between § 2254(d)(2) and § 2254(e)(1) as "somewhat murky."  Clark v. Att'y Gen., Fla., 821 F.3d 1270, 1286 n.3 (11th Cir. 2016); see also Landers, 776 F.3d at 1294 n.4; Cave v. Sec'y, Dep't of Corr., 638 F.3d 739, 744-47 & n.4, 6 (11th Cir. 2011); Jones v. Walker, 540 F.3d at 1277, 1288 n.5.

Richter, 562 U.S. at 98).  Thus, "a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the] Court."  Richter, 562 U.S. at 102; see also Wilson, 834 F.3d at 1235; Marshall, 828 F.3d at 1285.  To determine which theories could have supported the state appellate court's decision, the federal habeas court may look to a state trial court's previous opinion as one example of a reasonable application of law or determination of fact.  Wilson, 834 F.3d at 1239; see also Butts v. GDCP Warden, 850 F.3d 1201, 1204 (11th Cir. 2017).  However, in Wilson, the en banc Eleventh Circuit stated that the federal habeas court is not limited to assessing the reasoning of the lower court.[11]  834 F.3d at 1239.  As such,

> even when the opinion of a lower state court contains flawed reasoning, [AEDPA] requires that [the federal court] give the last state court to adjudicate the prisoner's claim on the merits "the benefit of the doubt," Renico [v. Lett, 449 U.S. 766, 733 (2010)] (quoting [Woodford v. Visciotti, 537 U.S. 19, 24 (2002)]), and presume that it "follow[ed] the law," [Woods v. Donald, --- U.S. ---, 135 U.S. 1372, 1376 (2015)] (quoting Visciotti, 537 U.S. at 24).

Id. at 1238; see also Williams, 133 S. Ct. at 1101 (Scalia, J., concurring).  Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  Titlow, 134 S. Ct. at 16 (2013).  "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no

---

[11] Although the Supreme Court has granted Wilson's petition for certiorari, the "en banc decision in Wilson remains the law of the [Eleventh Circuit] unless and until the Supreme Court overrules it."  Butts, 850 F.3d at 1205 n.2.

possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102-03). "If this standard is difficult to meet, that is because it was meant to be." Richter, 562 U.S. at 102.

## VI. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S.Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S. Ct. 2052.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104.

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163. Since both prongs of the two-

part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Finally, "the standard for judging counsel's representation is a most deferential one." Richter, 562 U.S. at 105. "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel, 822 F.3d at 1262 (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105); see also Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004).

"The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

# VII. Findings of Fact and Conclusions of Law

## A. Ground One

As Ground One, Thompson asserts that trial counsel provided ineffective assistance of counsel by failing to obtain a competency evaluation by a mental health professional prior to trial. See Petition at 3, 16-18; Pet. Memo. at 11-16. He contends that counsel was aware of clear signs indicating the need for a competency evaluation. Petition at 16. Specifically, Thompson submits that during one of their consultations, he explained to counsel that he was having difficulty understanding what was happening, that he was not sleeping well because he was hearing voices that kept him awake at night, and that he was not understanding the purpose and need for a trial or a plea bargain. Id.; Pet. Memo. at 13. He asserts that he lacked a rational understanding, both legally and factually, of the proceedings against him, Pet. Memo. at 13 n.3, and that he lacked sufficient ability to consult with trial counsel. Id. at 16 n.5. He contends that counsel had reasonable grounds to believe that his competency was questionable and that a competency examination probably would have resulted in a finding that he was incompetent to stand trial. Id. at 15-16. As such, he submits that counsel's failure to investigate competency resulted in a trial that was fundamentally unfair. Petition at 16; Pet. Memo. at 15.[12]

Thompson exhausted this claim in state court, see Resp. Ex. 10, by asserting the following:

> Prior to Defendant's trial he met with counsel on several occasions to discuss possible dispositions and/or trial strategies in his case. At one point counsel for the Defendant presented the Defendant a plea offer for his case. The Defendant can not remember the exact terms of the plea, only

---

[12] Thompson notes that during the presentence investigation, it was determined that his IQ was 57, which borders mental retardation. Petition at 16 n.1.

that he explained to counsel that he did not understand what was happening, was having trouble understanding her, not sleeping well and just wanted to go to bed. Prior to trial the Defendant told counsel he was hearing voices and that they were keeping him up at night. The Defendant at this point was not competent and exhibiting clear signs of his incompetence. Counsel was under a duty to inform the trial court of this development and request that the Defendant be evaluated. Trial counsel's failure to do this prejudiced the Defendant to the extent that he was not able to decide for himself whether or not to proceed to trial or accept any pleas the State had offered in his case. Once at trial the Defendant was not able to make conscious, informed, or voluntary choices concerning critical aspects of his defense, i.e. making an intelligent choice to testify, consulting with counsel concerning a viable defense, e.g. misidentification or conviction of a lesser included…

. . .

In this instant case the Defendant told counsel that he did not and could not understand the purpose of (sic) need for a trial or a plea bargain, he further told counsel that he was hearing voices and that they were keeping him awake at night.

Resp. Ex. 10 at 2-3. The state circuit court denied Thompson's request for an evidentiary hearing, see id. at 4, and summarily denied postconviction relief as follows:

Ground One: In Ground One, the defendant claims his trial counsel was ineffective for failing to investigate his mental impairment and competency to stand trial. The Defendant alleges he has a very low IQ and that during the trial, he experienced hallucinations and confusion about the proceedings. He affirmatively alleges he was not competent at the time of his trial and sentencing. He states that he reported his condition to his attorney. He claims that no psychological evaluation was performed until the Pre-Sentence Investigation Report was assembled. In support of his allegations, the Defendant attaches an excerpt from the sentencing hearing showing his attorney revealed his IQ scores to the Court.

"In Florida state courts, neither a procedural nor a substantive competency claim of trial court error may be raised in a postconviction motion." Thompson v. State, 88 So. 3d 312, 316 (Fla. 4th DCA 2012) (citing Nelson v. State, 43 So. 3d 20, 33 (Fla. 2010)). "Florida courts, however, continue

to recognize a narrow claim of ineffective assistance of counsel for failure to raise a defendant's alleged incompetency. . . ." Id. (quote omitted). When reviewing a claim of ineffective assistance of counsel for failure to raise competency

> [A] postconviction movant is presumed to have been competent, and the burden is on the movant to show otherwise . . . . To be entitled to an evidentiary hearing on this type of claim, the movant must set forth clear and convincing circumstances that create a real, substantial and legitimate doubt as to competency. In making this determination, a court may consider the totality of the circumstances, including: (1) the nature of the mental illness or defect which forms the basis for the alleged incompetency; (2) whether the movant has a history of mental illness or documentation to support the allegations; (3) whether the movant was receiving treatment for the condition during the relevant period; (4) whether experts have previously or subsequently opined that defendant was incompetent; and (5) whether there is record evidence suggesting that the movant did not meet the Dusky[ v. United States, 362 U.S. 402 (1960)] standard during the relevant time period.

Thompson v. State, 88 So. 3d 312, 320 (Fla. 4th DCA 2012).

The Defendant has not alleged or documented any prior or subsequent mental impairment or mental health treatment. He has not alleged that, during his previous criminal proceedings, he was adjudicated incompetent or evaluated as incompetent by a mental health professional. Moreover, the record contains no evidence of any diagnosis by a mental health professional before or after the trial.

The standard in Dusky and Florida Rule of Criminal Procedure 3.211, requires that "the defendant has sufficient present ability to consult with a reasonable degree of rational understanding and whether the defendant has a rational, as well as factual, understanding of the pending proceedings." Thompson, 88 So. 3d at 319. Here, the Defendant gave appropriate responses during trial when waiving his right to

testify (Ex. C) and at sentencing when instructed by the Court on his right to appeal. (Ex. D). There is a notation of the Defendant (titled "defense" in the transcript) conferring with the attorneys when asked if he would present a defense. (Ex. C).

The sole documented deficiency presented by the Defendant is a very low IQ score. However, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Thompson, 88 So. 3d at 319 (quote omitted). The allegation of low IQ does not clearly and convincingly demonstrate the Defendant's incompetence during the relevant period. Nor do the circumstances as a whole, as alleged by the Defendant, show "that a reasonably competent attorney would have questioned competence to proceed." Thompson, 88 So. 3d at 319.

Florida Rule of Criminal Procedure 3.850(d) allows the summary denial of an application for relief if the "files[ ] and records of the case conclusively show that the movant is entitled to no relief. . . ." The record conclusively refutes the Defendant's allegations of his attorney's deficient performance for failing to investigate his mental incompetence to stand trial. Relief is denied. Reaves [v. State, 593 So. 3d 1150, 1151 (Fla. 1st DCA 1992)].

Resp. Ex. 13. The First District Court of Appeal affirmed Thompson's conviction and sentence per curiam without issuing a written opinion. Resp. Ex. 16.

Thompson contends that the state postconviction court's decision was contrary to and involved an unreasonable application of Strickland and Dusky v. United States, 362 U.S. 402 (1960). He also asserts that the state postconviction court erroneously determined the facts in light of the evidence presented in the state court proceeding, Pet. Memo. at 11, 16, and improperly denied his claim without a hearing. Id. at 15.

The First DCA's affirmance without written opinion qualifies as an adjudication on the merits, and the Court defers to that decision under §2254(d). See Butts, 850 F.3d at 1204 (citing Richter, 562 U.S. at 100). To the extent that review of the state trial court's written

opinion denying relief leads to the same conclusion under §2254(d) as reviewing the First DCA's summary affirmance, the Court may review the state trial court's written explanation for its rejection of Thompson's claim.  See Butts, 850 F.3d at 1204 & 1205, n.2 (where "it does not matter to the result, and to avoid any further complications if the United States Supreme Court disagrees with [the] Wilson decision," the federal habeas court may apply § 2254(d) by deferring to "the more state-trial-court focused approach.").[13]  Applying the deference due state courts under AEDPA, the Court asks "whether any fairminded jurist could agree with the state trial court's decision denying [Thompson] habeas relief."  Id. at 1205 (citations omitted).  "If some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."  Id. (quotations and citation omitted).

Preliminarily, the Court notes that the postconviction court properly identified the standards under Strickland and Dusky.  Having done so, the court concluded that the circumstances as a whole, as alleged by Thompson, failed to show that a reasonably competent attorney would have questioned Thompson's competence to proceed.  Resp. Ex. 13 (citing Thompson, 88 So. 3d at 319).  Notably, absent a showing of clear and convincing circumstances that created a real, substantial and legitimate doubt as to his competency, Thompson was not entitled to an evidentiary hearing and could not show that his attorney should have questioned his competency.[14]  See Thompson, 88 So. 3d

---

[13] Under Wilson, however, the Court is not limited to assessing the reasoning of the lower court.  See id. at 1239.

[14] "A defendant is competent to stand trial if he possesses (1) sufficient present ability to consult with his attorney with a reasonable degree of rational understanding, and (2) a rational and factual understanding of the proceedings against him."  Pardo v. Sec'y, Florida Dep't of Corr., 587 F.3d 1093, 1100 (11th Cir. 2009) (citing Dusky v. United States, 362 U.S. 402 (1960) (per curiam); Fla. R.Crim. P. 3.211(a)(1)).

at 320. Applying double deference to the state postconviction court's decision that Thompson's counsel did not perform deficiently, see Daniel, 822 F.3d at 1262; see also Richter, 562 U.S. at 104; Strickland, 466 U.S. at 689, the Court finds that a fairminded jurist could agree with the state court's decision denying Thompson habeas relief. As such, the state postconviction court did not unreasonably apply Strickland or Dusky and did not unreasonably determine the facts.

Counsel's duty to investigate competency includes the duty "to make reasonable investigation into petitioner's competency" or "to make a reasonable decision that such investigation was unnecessary." Futch v. Dugger, 874 F.2d 1483, 1487 (11th Cir. 1989); see also Pardo, 587 F.3d at 1102. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 1102 (citing Strickland, 466 U.S. at 691). The reasonableness of counsel's decision whether to investigate competency depends critically upon what information the client communicated to counsel. Cf. Chandler v. United States, 218 F.3d 1305, 1324 (11th Cir. 2000); see also Strickland, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."). Also, the reasonableness of counsel's performance must be considered "from counsel's perspective at the time." Chandler, 218 F.3d at 1316 (quoting Strickland, 466 U.S. at 690).

Despite Thompson's current assertions, nothing in the pretrial or trial record suggests that counsel should have requested a competency examination of Thompson.[15]  To the contrary, despite Thompson's prior experience with the criminal justice system, the record contains no evidence that he had been adjudicated incompetent in any previous proceeding, or that any such finding has since been made.  During trial, Thompson responded appropriately to the court's questions, even if his interactions with the trial court were few, and appeared to confer with counsel.[16]  As a whole, the trial record lacks anything to suggest that Thompson failed to understand the proceedings or communicate with counsel.

After Thompson was convicted at trial, his counsel moved to continue the sentencing to arrange for an examination of Thompson "for two purposes," which counsel did not specify on the record.  If the examination yielded any expert opinion reports, such reports

---

[15] Thompson fails to submit or proffer any evidence to support his assertions that (1) when counsel presented him with a plea offer from the State, he explained to counsel that he did not understand what was happening, he had trouble understanding counsel, he was not sleeping well, and  he just wanted to go to bed; (2)  prior to trial Thompson told counsel that he was hearing voices and that they were keeping him awake at night; (3) Thompson was not able to decide for himself whether or not to proceed to trial or accept any pleas the State had offered in his case; (4) at trial Thompson was not able to make conscious, informed, or voluntary choices concerning critical aspects of his defense, i.e. making an intelligent choice to testify, consulting with counsel concerning a viable defense, e.g. misidentification or conviction of a lesser included; (5)  Thompson told counsel that he did not and could not understand the purpose or need for a trial or a plea bargain.  See Resp. Ex. 10.  Although an evidentiary hearing in state court could have developed the facts, the Court defers to the state trial court's decision that Thompson failed to set forth clear and convincing circumstances that create a real, substantial and legitimate doubt as to competency.  See Resp. Ex. 13 (citing Thompson v. State, 88 So. 3d 312, 320 (Fla. 4th DCA 2012)).

[16] The record reflects that Thompson answered the court's questions four times during the entire case, uttering a total of fifteen words.  See Resp. Ex. 1 at 126 ("No, sir."); 134 ("Yes."; (Shakes head negatively.); (Nods head affirmatively.)); Resp. Ex. 3A at 207 ("Yes, sir."); 356 ("Yes, sir."; "Yes, sir."; "No, I'm not, sir."; "No, sir.").

are not contained in the record before this Court. At sentencing, counsel proffered as mitigation that a report indicated that Thompson had a full scale IQ of 57 and was in slow classes throughout school.[17] Resp. Ex. 1 at 127. But counsel did not suggest that any reports or examinations resulted in a finding that Thompson suffered from any mental illness or was incompetent. Nor does Thompson present any evidence that he has ever been found to suffer from any mental illness, or ever received treatment for any mental illness.

On this record, the Court presumes that counsel carried out her professional responsibility and made a reasonable decision not to investigate Thompson's competency prior to or during trial. Cf. Chandler, 218 F.3d at 1324 ("[G]iven the absence of evidence in the record, we must assume counsel carried out his professional responsibility and discussed mitigation with his client.") (citing Williams v. Head, 185 F.3d 1223, 1235 (11th Cir.1999)). "In short, trial counsel, based on [her] professional judgment as an experienced trial lawyer, determined (or some reasonable lawyer could have) that" a competency evaluation was not warranted.[18] Chandler, 218 F.3d at 1325. Other than

---

[17] Although counsel described Thompson's IQ scores as "[i]ndicating that he borders on the borderline of retarded," Resp. Ex. 1 at 127, a full-scale score of 57 falls in the range of mild mental retardation. See Burgess, 723 F.3d at n.8 ("The American Psychiatric Association explains that the term 'mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70." (citing Diagnosic and Statistical Manual of Mental Disorders 42-43 (rev. 4th ed. 2000)); see also Hunter v. Ferrell, 587 F.3d 1304, 1305 (11th Cir. 2009). Also in Hunter, the Eleventh Circuit relied on a licensed psychologist's testimony to find that "ordinarily someone with Hunter's mental condition [an IQ of 59 and additional factors] would not have sufficient understanding to be considered competent." Id. at 1309.

[18] When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger. Chandler, 218 F.3d at 1316. Here, records from the Florida Bar indicate that Thompson's lead trial counsel,

his self-serving, conclusory assertions, Thompson proffers no evidence in support of his claim that he gave his counsel reason to believe that an investigation into his competency would have been fruitful.[19]  He fails to carry his burden of overcoming the presumption that counsel's decision not to investigate his competency was reasonable.  See id. at 1313–14 (citing Strickland, 104 S. Ct. at 2064) (on postconviction review, petitioner bears the burden of persuasion to prove, by a preponderance of competent evidence, that his counsel's performance was unreasonable).  As such, the state court's decision was neither contrary to nor an unreasonable application of Dusky or Strickland,[20] and it did not result from an unreasonable determination of the facts in light of the evidence.[21]  Thompson's request for relief as to Ground One is denied.

_____

Melina Buncome-Williams, graduated from law school in 1993 and joined the Florida Bar in 1994.

[19] As the state postconviction court found, (1) Thompson had not alleged or documented any prior or subsequent mental impairment or mental health treatment; (2) Thompson had not alleged that, during his previous criminal proceedings, he was adjudicated incompetent or evaluated as incompetent by a mental health professional; (3) the record contained no evidence of any diagnosis by a mental health professional before or after the trial; (4) the transcript reflects that Thompson gave appropriate responses during trial when waiving his right to testify and at sentencing when instructed by the Court on his right to appeal; (5) the transcript reflects that Thompson conferred with the attorneys when asked if he would present a defense; (6) the sole documented deficiency presented by Thompson was a very low IQ score, which does not clearly and convincingly demonstrate his incompetence during the relevant period.  See Resp. Ex. 13.

[20] Even if Thompson could show that his counsel performed deficiently by making an unreasonable decision not to investigate his competency, Thompson's claim would fail because he would not be able to show prejudice under Strickland.  "In order to demonstrate prejudice from counsel's failure to investigate his competency, petitioner has to show that there exists at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent to stand trial."  Futch, 874 F.2d at 1487 (quotations and citations omitted).  Thompson presented no such evidence to the state court or this Court.

[21] To the extent Thompson complains about the failure of the state court to hold an evidentiary hearing, he failed to allege facts which if proven would entitle him to relief.

**B. <u>Ground Two</u>**

As Ground Two, Thompson asserts that the state court violated his Fifth, Sixth and Fourteenth Amendment rights when the trial court denied his right to access the courts, which prohibited him from asserting meritorious and substantial claims that were reasonably likely to have warranted a new trial based on the denial of the effective assistance of trial counsel. <u>See</u> Petition at 19. Specifically, he asserts that

> On April 4, 2012, the petitioner filed a pro se motion seeking permission to supplement his postconviction Rule 3.850 motion filed on November 12, 2010. In his motion seeking to supplement, the petitioner alleged that he recently discovered several meritorious issues that are necessary to incorporate in his Rule 3.850 motion.
>
> On August 13, 2013, the postconviction court denied petitioner's motion to supplement finding that the motion is untimely and barred from review as it was filed past the two year deadline for applying for postconviction relief. The petitioner appealed to the First District Court of Appeal arguing that the postconviction court's finding was erroneous as his motion seeking to supplement his currently filed Rule 3.850 motion was timely filed as the filing occurred sometime during the eighteenth month of his postconviction term of two years. Although not specifically referenced, the body of petitioner's motion to supplement his Rule 3.850 motion and his appeal to the court's denial of the motion in his initial brief, seeks timely access to the courts and on appeal in argument to the postconviction court's denial, the context of argument indicating his displeasure and contention with such denial as it denied him access to the courts. The First District Court of Appeal per curiam affirmed the postconviction court's denial.

Petition at 19-20. Respondents contend that Thompson failed to exhaust his claim because he did not fairly present it as a federal constitutional claim on appeal to the First DCA. Response at 29-33.

Reviewing Thompson's state court filings, he filed a Motion for Permission to Leave to Supplement Defendant's Original Motion for Post Conviction Relief by mailbox rule on

April 4, 2012. Resp. Ex. 11. In that motion, Thompson requested permission to supplement his pending Rule 3.850 Motion because he had "recently discovered several meritorious issues that needs (sic) to be incorporated in his original filed Rule 3.850 motion for postconviction relief." Id. at 8. He did not elaborate on the allegedly meritorious issues. The state circuit court summarily denied Thompson's motion, stating:

> The record shows the judgment and sentence in this case became final on December 31, 2009, in a Mandate issued by the First District Court of Appeal in case no. 1D08-6308. (Ex. A). The instant Motion seeks permission to submit additional arguments for review past the two(2) year deadline for applying for postconviction relief. Fla. R. Crim. P. 3.850(b). The proposed supplement is untimely and, therefore, barred from review. Diresta v. State, 860 So. 2d 1052, 1053 (Fla. 5th DCA 2002).

Resp. Ex. 12.

Following the denial of his Rule 3.850 motion (Resp. Ex. 13), Thompson appealed the circuit court's denial of his motion to supplement to the Florida First DCA as Issue II of his optional pro se initial brief. Resp. Ex. 15 at 6-8. Essentially, Thompson contended that the state circuit court erred by applying Florida Rule of Criminal Procedure 3.850(b) instead of Rule 3.850(e) to determine the timeliness of his motion to amend. Id. at 7-8. He relied exclusively on state law. Id.

On this record, the Court concludes that Thompson failed to fairly present this claim as a federal constitutional claim in state court and that it is procedurally defaulted. See Baldwin, 541 U.S. at 29; Duncan, 513 U.S. at 365-66; Preston, 785 F.3d at 456-59; Owen, 568 F.3d at 908, n.9. Thompson offers no excuse such as cause and prejudice or fundamental miscarriage of justice for his failure. See Maples v. Thomas, 132 S. Ct. at 922. In addition, the Court concludes that Thompson's claim remains one of state law

merely couched in federal constitutional terms. See Branan v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1988) ("Although petitioner alleges violations of federal law, it is clear that this petition is based exclusively on state law issues which are merely couched in terms of equal protection and due process.") (quotation omitted). Federal habeas relief cannot be issued based on perceived errors of state law. Finally, even if Thompson had presented his federal claim in state court, the state court's order was not contrary to or an unreasonable application of clearly established federal law, and it did not result from an unreasonable determination of the facts. See 28 U.S.C. § 2254(d); Christopher v. Harbury, 536 U.S. 403 (2002). Thompson's request for relief as to Ground Two is denied.

## VIII. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Thompson seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Thompson "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484.

However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.   The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.   The **Clerk of the Court** shall enter judgment denying the Petition and dismissing this case with prejudice.

3.   If Thompson appeals the denial of the Petition, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.   The **Clerk of the Court** is directed to close this case and terminate any pending motions.

DONE AND ORDERED at Jacksonville, Florida, this 14th day of August, 2017.

MARCIA MORALES HOWARD
United States District Judge

lc22
c:
Enrico L. Thompson, FDOC # 306044
Counsel of Record